EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff-Appellant,

v.

BALL CORPORATION, et al., Defendants-Appellees.

No. 79-3768.

United States Court of Appeals, Sixth Circuit.

Argued April 17, 1981.

Decided Sept. 23, 1981.

As Amended Nov. 10, 1981.

532

Eva R. M. Thurman, Lawrence Mays, Bruce B. Elfvin, Regional Atty., Equal Employment Opportunity Commission, Cleveland, Ohio, Leroy D. Clark, Melissa Langa, Gen. Counsel, Walter M. Lowney, Acting Associate Gen. Counsel, Equal Employment Opportunity Commission, Washington, D. C., for plaintiff-appellant.

Thomas A. Piraino, Jr., Jones, Day, Reavis & Pogue, Cleveland, Ohio, for Ball.

Eben H. Cockley, Harley M. Kastner, Gen. Counsel, Cleveland, Ohio, Charles Armstrong, Asst. Gen. Counsel, . Akron, Ohio, for U.R.W.

Before KEITH and JONES, Circuit Judges, and ENSLEN, District Judge.*

KEITH, Circuit Judge.

On April 30, 1971, Mildred Darling filed a charge with the Equal Employment Opportunity Commission (EEOC) alleging that the Ball Rubber Corporation discriminated against women. This charge was served on the company on March 29, 1972. Two years later, an EEOC investigation commenced. After conciliation efforts proved unsuccessful, the EEOC filed an action on January 13, 1976, in federal district court against the Ball Rubber Corporation (the company), the Chardon Rubber Company, and the United Rubber, Cork, Linoleum and Plastic Workers of America, Local Union No. 557 (the union).[1] The complaint charged that the defendants violated Title VII of the Civil Rights Act of 1964, as amended 42 U.S.C. 2000e et seq. (1976) by engaging in sex discrimination. The district court for the Northern District of Ohio ruled for the defendants. For the reasons discussed below, we affirm in part and reverse in part.

FACTS

The Ball Rubber Corporation operates a manufacturing plant in Chardon, Ohio.

The plant produces a wide variety of extruded and molded industrial rubber products.[2] All major production steps in the manufacturing of these rubber products are performed at Chardon. Employees at the plant mix batches of rubber, assemble molds, and trim and package final products.

The Chardon plant is divided into a number of departments with each department containing one or more job classifications. Collective bargaining agreements between the Ball Corporation and the Union govern employment in each of these departments. Until April 30, 1976, eight of the departments employed only males, two employed only a token number of females, one employed virtually all females and five employed males and females.[3] Until 1974, the Chardon plant had no job classifications that were filled by both male and female employees. Between 1974 and 1976, a few women transferred into previously all-male job categories, but as of January 1976 when the EEOC filed this suit, only seven of 168 women worked in job classifications which included men. In that year, more than 60 job classifications at the Chardon plant had never been filled by women.

Female employees at the Chardon plant have been, for the most part, confined to

---

* The Honorable Richard A. Enslen, United States District Court for the Western District of Michigan, sitting by designation.

1. The United Rubber, Cork, Linoleum and Plastic Workers of America, Local Union No. 557 (hereinafter the "Union") was joined as a necessary party under Fed.R.Civ.P. 19. Prior to the trial of this action, it was stipulated by the parties that no recovery would be sought against the Union and that the Union would not have to defend against this action.

Chardon Rubber Company, which in 1978 purchased the Chardon plant from Ball Rubber Corporation, was also excused by stipulation from any direct liability. The parties agreed that any liability against Chardon Rubber would depend entirely upon employment practices at the Chardon plant before the 1978 sale. The EEOC stipulated that Chardon Rubber does not presently discriminate against women.

2. Examples of the industrial rubber products manufactured at the Chardon plant include jar rings, sewer gaskets and automobile window

gaskets. These products are manufactured according to customer requirements.

3. Between July 1, 1967 and April 30, 1976, Ball Corporation employed only men in the following departments: (1) Banbury (155 men, 0 women); (2) Boiler Room (4 men, 0 women); (3) Extruding (342 men, 0 women); (4) Press (317 men, 0 women); and (5) Shipping and Receiving (46 men, 0 women).

During this period, two departments contained a token number of female employees: (1) Laboratory Department (35 men, 3 women) and (2) Maintenance Department (114 men, 1 woman).

The McNeil Press Department was virtually all-female during this period: (1 man, 164 women). The following departments had substantial numbers of male and female employees: (1) Administrative/Management (3 men, 3 women); (2) Extruded Cutting and Finishing (19 men, 35 women); (3) Press Finishing (84 men, 391 women); (4) Plastic and Blow Molding (176 men, 122 women) and (5) Splicing (75 men, 355 women).

the "finisher" job classification.[4] Finishers perform relatively simple cutting, trimming and packaging duties and they are among the lowest paid employees in the plant. Aside from the few previously all-male positions obtained by women after 1974, the only other jobs held by women at Chardon were low-paying "female" positions such as "janitor women", "sample girl" and "assemblers".[5] This departmental segregation was the subject of a consent decree signed on July 17, 1979.[6]

The Chardon plant's press operations are performed in Departments 112 and 113. Until 1961, these operations were carried out on conventional presses operated exclusively by male employees. Conventional presses apply hydraulic pressure and steam heat to molds which typically weigh between 250 and 2,000 pounds. These molds are slid by hand from the press onto a hydraulic table in front of the mouth of the machine. The operators then remove the cover of the mold by using electric chain hoists and pry bars. Then, with the assistance of compressed air hoses, the conventional press operators separate the rubber parts from the mold.

In 1961, the first McNeil press was introduced at the Chardon plant. McNeil presses are electric rather than hydraulic. At the end of a run, McNeil presses open automatically in book fashion to allow an operator to remove the product from the mold. Once the finished product is removed and rubber stock again placed in the mold, the mold is automatically closed and placed back in the press at the push of a button. Unlike conventional presses, McNeil presses at the Chardon plant have always been operated by women. Currently, all 36 McNeil presses at Chardon are located in Department 112.[7]

In addition to the conventional presses, Department 113 also contains five French Oil presses and 16 St. Joseph presses.[8] French Oil presses are fully automatic and operate in much the same manner as the McNeil presses. St. Joseph presses, on the other hand, are not significantly automated. They are similar to conventional presses, except St. Joseph presses have "mold movers" which pull molds out of the press and then push them back into place. Department 113 workers who operate a French Oil press simultaneously operate two conventional presses each. Department 113 work-

4. The evidence at trial indicated that in 1965, all but four of 111 female employees at the plant were "finishers"; in 1970, all but 13 of 182 female employees were "finishers"; and in January 1976, all but seven of 168 female employers were "finishers". Thus, even in the departments at Chardon that were not segregated, women were still confined to virtually the same job classifications.

5. As Ball Corporation points out in its Brief, the terms "sample girl" and "janitor women" were last used in the 1963 collective bargaining agreement. The corporation and union substituted neutral terms after that year. The EEOC, however, uses the obsolete titles in its Exhibits for 1972 and 1975 apparently because several of the jobs performed in those years by women were jobs formerly entitled "sample girl" and "janitor women".

6. The July 17, 1979 Consent Decree reads in relevant part:

this partial Consent Decree is intended to and does resolve the following issues in controversy between the EEOC, Ball and Chardon Rubber:

The alleged discriminatory initial hiring and assignment of females at the Chardon plant and the applicable back pay.

\*    \*    \*    \*    \*    \*

Chardon Rubber, its officers, agents, successors, and assigns agree not to fail or refuse to initially hire or assign females to available vacancies at its Chardon, Ohio plant on any basis other than the capabilities and/or qualifications of the individual applicant relative to the capabilities of other applicants.

The Consent Decree also provided that Ball would pay back pay to those female production employees hired by Ball from March 15, 1972 through June 1, 1976, who applied before male applicants but were hired after the male applicants.

7. The entire workforce of Department 112 is female.

8. At the time the EEOC filed this action, one of the St. Joseph presses had been converted into a conventional press. At the time the district court rendered its judgment, eight of the St. Joseph presses had been converted to conventional presses.

ers who operate St. Joseph presses simultaneously operate conventional presses.

The EEOC's complaint, filed in the district court, alleged that between July 2, 1965 and September 8, 1978 and later, the defendants violated Title VII in the following ways: (1) by failing "to compensate women in the McNeil Press Department and in the Press Finishing Department for the eight-hour shift, while men in other departments are compensated for the eight-hour shift"; (2) by failing to "compensate women in the McNeil Press Department in .the same manner as it compensates male press operators for substantially similar work"; (3) by "maintaining sex segregated job classifications and departments [which] adversely [affect] the ability of women to transfer and be promoted because of their sex"; (4) by "maintaining, in the collective bargaining agreement, a departmental seniority system which perpetuates the sex segregated job classifications and departments"; and (5) by failing "to hire and assign women in the same manner men are hired and assigned to positions."

Evidence introduced at trial showed that the transfer and promotions policies at Chardon resulted in few women in the higher-paying positions at the plant. Before 1969, job vacancies at Chardon were not posted, and the plant's management generally filled vacancies in any manner that it wished. After 1969, Ball Corporation and the union agreed that all vacancies would be posted and a job would go to the most senior qualified bidding employee in the department. If no department employee expressed an interest, then plantwide seniority would be used to bid on a vacancy. Finally, if no plant bids were received, then the corporation would resort to the recall list. The EEOC argued at trial that this procedure constituted disparate treatment of women because of the pre-existing segregated nature of many of the plant's departments. Moreover, the EEOC charged that plant management actively discouraged women from competing for the higher-paying jobs at the plant.

Salaried or supervisory positions at the Chardon plant were filled by the plant superintendent on the basis of subjective criteria. Evidence showed that between 1965 and 1976, the plant employed no women in these positions. After the EEOC notified the corporation of the failure of conciliation, the plant made a number of salaried job offers to women. After the EEOC filed suit, the plant made three more offers.

Evidence at trial also showed that Ball Corporation paid its Department 113 workers more per hour than it paid its McNeil press operators. The former are all-male, the latter are all-female; the EEOC maintained that the two groups of workers performed substantially the same work.

In addition, the EEOC maintains that the evidence below established that Ball Corporation and the union entered into collective bargaining agreements between 1966 and 1972 that called for male employees at the plant to work and be paid for a full eight hours when the plant ran three eight-hour shifts a day. The agreement provided that in that situation, female employees would be paid for only seven and one-half hours.[9]

9. The 1966 Collective Bargaining Agreement reads in relevant part:

Section 2. When an operation is scheduled for two (2) or less shifts, then the normal day for persons employed on such operation shall consist of eight and one-half (8½) consecutive hours, including a thirty (30) minute unpaid lunch period.

Section 3. When an operation is scheduled for three (3) shifts, the normal work day for women employees shall be eight and one-half (8½) consecutive hours, including a thirty (30) minute unpaid lunch period, provided there are no machine limitations. Where there are machine or other limitations mak-

ing it impractical to overlap employees, the normal work day for women employees shall be eight (8) consecutive hours, including a thirty (30) minute unpaid lunch period.

Section 4. When an operation or a machine is scheduled for three (3) shifts, the normal work day for male employees, except service men throughout the plant and those employed in the Cove Painting Department, shall be eight (8) hours and such employees shall eat their lunch during such working hours at a time when the work load permits without unduly interfering with the efficient performance of their duties. Service men throughout the plant and male employees in

The district court held that the EEOC failed to make out a *prima facie* case of employment discrimination. The court found the statistical evidence introduced by the EEOC insufficient to establish disparate treatment resulting from either the plant's transfer or promotions policies. It also found that McNeil press operators did not perform substantially the same work as Department 113 employees and that the company's lunch policies, as they impacted differentially on male and female employees, were justified by business necessity.

## I. TRANSFER AND PROMOTIONS

The district court, pursuant to Fed.R. Civ.P. 41(b), dismissed the transfer and promotion issue concerning the hourly positions at the plant. The district court ruled that the EEOC failed to make out a *prima facie* case that Ball Corporation's employment practices discriminated against women. The Court reached this conclusion because although

> [t]he statistical evidence adduced in this case does indicate that female employees at Ball were not promoted as frequently as male employees, and that there were certain departments into which they did not transfer. This evidence, however, was not buttressed with evidence of specific acts of discrimination against women, as was the statistical data in *Teamsters.*

At the close of all of the evidence, the district court entered judgment for the defendant on the discrimination claim concerning the promotion of female employees from hourly positions to salaried positions.

In making this ruling, the district court did not have the benefit of our recent decision in *Marsh v. Eaton Corporation*, 639 F.2d 328 (6th Cir. 1981). In *Marsh*, the

---

the Cove Painting Department shall, under such circumstances, have a work day consisting of eight and one-half (8½) consecutive hours, including a thirty (30) minute unpaid lunch period with overlapping shifts.

Gender neutral terms replaced the above provisions in the 1972 collective bargaining agreement:

---

evidence at trial showed that sixty females were employed in the defendant's plant. Twenty-eight of these women were employed as machine tenders, the lowest position in the Springtite Department. Thirty were employed in the lowest position in the Ring Department. No men were employed in either position. As in the instant case, the low-paying positions occupied by the female employees were once explicitly termed female jobs. In *Marsh*, the explicit sex classification was removed in 1965, but statistical evidence showed that during 1974–1977, the four years prior to trial, tacit sex segregation remained. Of the 44 people hired with no previous experience, 27 were female and 17 were male. All 27 females were placed in the low-paying Springtite and Ring Department positions; only 9 of the 17 men were placed in these positions. The other eight males were placed in more attractive positions at the plant. This court found that this statistical showing was sufficient to make out a *prima facie* case of disparate treatment. Judge Merritt stated for the majority:

> The evidence presented indicates that all females were channeled into two jobs. Although some males were also placed in these jobs, almost half of the inexperienced males were placed in higher paying positions. There was no evidence that the inexperienced males were qualified for jobs other than machine tender/junior inspector or that the inexperienced females were not so qualified. *Id.* at 330 (citations omitted).

We believe that the statistical showing made by the EEOC in this case was as strong as the showing made in *Marsh*. Before 1969, promotions and transfers at the Chardon plant were based on purely subjective criteria. Female transfers or promotions to higher-paying positions were negligible. After 1969, the plant instituted a

---

When a department or a portion thereof is scheduled for three (3) shifts, the normal work day for finishers shall be eight (8) hours including a thirty (30) minute unpaid lunch period. All other production workers will work eight (8) hours and eat their lunch at a time when the work load permits without unduly interfering with the efficient operation of their duties.

new policy. Job vacancies were filled based on departmental seniority, then based on plant-wide seniority, and finally if the vacancy still remained, based on the recall of employees on layoff. After 1969, salaried positions at the plant continued to be filled on the basis of subjective criteria. Before 1975, no females held salaried positions at the Chardon plant.

The EEOC's statistical evidence showed that in 1968, the male promotion rate was almost ten times the female rate. In 1974, it was still more than twice the female rate. As the following table demonstrates, between 1966–75 the average male promotion rate was three times the average female promotion rate:

| Year | Percentage of Total Male Workforce Promoted | Percentage of Total Female Workforce Promoted |
|---|---|---|
| 1966 | 23.4 | 4.9 |
| 1967 | 31.9 | 10.7 |
| 1968 | 23.0 | 2.4 |
| 1969 | 33.0 | 7.1 |
| 1970 | 37.5 | 12.8 |
| 1971 | 29.8 | 11.8 |
| 1972 | 34.2 | 6.1 |
| 1973 | 21.0 | 7.0 |
| 1974 | 23.5 | 10.3 |
| 1975 | 32.9 | 9.0 |
| **Average** | 25.8 | 8.1 |

Under the facts and circumstances of this case, this showing of statistical disparity in the promotions and transfer practices was sufficient by itself to establish a *prima facie* case of disparate treatment. *See International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 340, 97 S.Ct. 1843, 1857, 53 L.Ed.2d 396 (1977) (the "usefulness [of statistics] depends on all of the surrounding facts and circumstances"); *Marsh v. Eaton, supra* at 329–31, *Harless v. Duck*, 619 F.2d 611, 615 (6th Cir.), *cert. denied*, 449 U.S. 872, 101 S.Ct. 212, 66 L.Ed.2d 92 (1980). *See also Davis v. Califano*, 613 F.2d 957, 962 (D.C. Cir. 1979) ("statistical proof may alone be used, without presentation of specific instances of discrimination, to establish a *prima facie* case of employment discrimination"); *Jones v. Lee Way Motor Freight, Inc.*, 431 F.2d 245, 247 (10th Cir. 1970), *cert. denied*, 401 U.S. 954, 91 S.Ct. 972, 28 L.Ed.2d 237 (1971) ("In racial discrimination cases, statistics often demonstrate more than the testimony of many witnesses, and they should be given proper effect by the courts").

However, the EEOC did not rely solely on statistical evidence below to establish disparate treatment. The EEOC introduced evidence showing that despite the existence of the facially neutral written promotions and transfer policies, female employees were, in practice, actively discouraged from applying for higher paying jobs. For example, Dorothy Yommer testified that in 1974 when she was the senior bid on a service labor job, her supervisor and plant superintendent actively attempted to discourage her from taking the job.[10] Carol Dimitroff testified that in 1978 she

10. The district court correctly noted that Ms. Yommer eventually received the service labor position and three months later received a position as a Plastic Blow Mold Operator. However, the fact that she eventually received these positions does not mean that her testimony failed to buttress the EEOC's statistical showing of disparate treatment. The following portions of her testimony supports the EEOC's contention that Ball treated men and women differently for purposes of promotions and transfers:

Q. How long were you a Service Laborer in the Plastics Department?
A. Approximately three months.
Q. Did you bid into the Service Laborer's position?
A. Yes.
Q. Do you recall when you placed your bid for that particular position?
A. It could have been in January of 1974.

Q. Do you recall how long it was from the time you placed your bid to the time that you received the job as a service laborer?
A. I don't recall definitely, but it was within weeks.
Q. Do you recall discussing your bid for the Service Laborer's job with anyone?
A. Yes, I do.
Q. And with whom did you discuss your bid for the Service Laborer's job?
A. Well, at the time that I decided to bid on the job, I put my name on the bid sheet, and then I had a few discussions with management.
Q. Who in management did you have discussions with?
A. Well, my Supervisor at that time, for one, and I think a forman who was an Acting Supervisor.
Q. Who was the Supervisor?
A. At that time Dick VanDarsick.

**538**

was the senior bid on a conventional press position. Ms. Dimitroff was not given the usual "reasonable break-in period" by the department supervisor. Instead of two to three weeks training time, she was given two days to learn the new job. She could not master all the required tasks in that time and had to give up the promotion.[11] Ettas Kramer testified that in 1974 she was the senior bid on a tube machine operator job. However, pursuant to the plant doctor and personnel office's orders, she was told to remove her name from the bid sheet because the tube machine operators job was deemed too strenuous.

Thus, the district court's finding that the EEOC's statistical evidence was not sup-

Q. What did you discuss with him?
A. He asked me if I thought I was capable of handling the job, and I said that I thought I was, and he asked me to show him that I was capable of handling the job, and this was before I got the bid.
Q. How did you show him that you qualified for the job?
A. Well, he told me to perform some of the duties of Service Laborer, and specifically to stack some cartons, to show him I can handle them, that it was part of my job.
Q. Did you discuss your bid with someone else?
A. Yes, with Mr. Bonness, and also the Acting Supervisor.
Q. Who was Mr. Bonness at that time?
A. Burt Bonness. I don't recall his exact title. I think it was Plant Manager or Production Manager, or something I don't know his exact title.
Q. What was the extent of the discussion with Mr. Bonness?
A. Well, he, too asked me if I thought I could handle the job, and I told him that I thought that I could.
Well, prior to this I had been asked to take my name from the bid sheet, prior to the discussion of Mr. Bonness.
Q. Who asked you to do that?
A. The Acting Supervisor.
Q. Who was that?
A. Lyle Hiccox.
 *     *     *     *     *     *
Q. When did you meet with him?
A. I think that it was the following day after I put my name on the bid sheet.
Q. What did you discuss with him?
A. With Mr. Bonness or with the Supervisor?
Q. With the Supervisor.
A. He told me that I was supposed to go over to the Personnel Office and take my name off the bid sheet, that they were going

ported by "specific acts of discrimination against women" is clearly erroneous. We believe that even if the statistical evidence here was not sufficient to establish a *prima facie* case of disparate treatment, the testimony discussed above, contrary to the district court's finding, enabled the EEOC to carry its burden of establishing a *prima facie* case. Accordingly, the court's dismissals of the transfer and promotions issues were in error.

## II. BONA FIDE SENIORITY SYSTEM

██ Ball Corporation asserts on appeal that its promotions and transfer policies qualify as a *bona fide* seniority system un-

to give me a job in the Plastics Department as a Finisher on the day shift, which was the shift that I preferred to be on, and I refused.
Q. You refused to take your name off of the bid sheet?
A. Correct.
Q. Was there any further discussion?
A. Then later, I believe the same day as when I had the discussion with Mr. Bonness, either the same day or the following day, and then I had a discussion with Mr. Bonness over the same thing.
He wanted to know if I thought I could handle the job, and I said that I thought that I was quite capable of handling the job, and he said there would be quite heavy lifting and moving and lugging large drums of material to be moved around, weighing 200 to 300 pounds, and I said, "I have already demonstrated I can do that type of work," and so he said, "We will let you try the job, however, you are not allowed to drive the towmotor."
In addition, Ms. Yommer testified that she was ordered to have a physical examination about a week after she bid for the new position. However, to her knowledge, no male employee bidding for the job had ever been required to have a physical examination. Tr. at 659–672.

**11.** In 1974, Ms. Dimtroff was recalled from a layoff and offered a position in the Banbury Department. She refused the position because the work was "too dirty." She also refused a position in the Hose and Washer Department because no women worked in the department. It is not clear, however, which job classifications she was offered in these two departments. Moreover, even if she was offered traditionally male positions, this does not detract from her testimony that her application for the conventional press position was treated differently from the application of male employees.

der Section 703(h) of Title VII, Civil Rights Act of 1964, 42 U.S.C. § 2000e–2(h).[12] In *Teamsters v. United States, supra,* the Supreme Court held that Section 703(h) exempts from Title VII liability those "neutral, legitimate system[s]" that do not have [their] genesis in racial [or sexual] discrimination and that . . . [were] negotiated and . . . maintained free from any illegal purpose." 431 U.S. at 353–56, 97 S.Ct. at 1863–1865. Thus, if an employer shows that differences in pay or employment conditions result from the operation of a *bona fide* seniority system, the plaintiff's *prima facie* case is effectively rebutted.

■ Ball Corporation made no such showing below. Since the district court dismissed the promotions and transfer issues for failure of the EEOC to make out a *prima facie* case, Ball Corporation had no occasion to demonstrate that its promotions and transfer policies constitute a *bona fide* seniority system. It is not clear from the record whether seniority is even the operative factor in the promotion or transfer of women at the plant.[13] Accordingly, we must remand to the district court the issue of whether Ball's promotions and transfer policies are a *bona fide* seniority system within the meaning of Section 703(h).

■ On remand, the district court should allow the parties to present additional evidence of: (1) whether the transfer and promotions policies in effect at the plant operate "to discourage all employees equally from transferring between seniority units," and (2) whether the policies were "negotiated and . . . maintained free from any illegal purpose." *James v. Stockham Valves & Fitting Co.,* 559 F.2d 310, 352 (5th Cir. 1977), *cert. denied,* 434 U.S. 1034, 98 S.Ct. 767, 54 L.Ed.2d 781 (1978). *See also United States v. Georgia Power Co.,* 634 F.2d 929 (5th Cir. 1981); *Hameed v. International Association of Bridge, Structural and Ornamental Iron Workers,* 637 F.2d 506, 517 (8th Cir. 1980). If the evidence requires a negative answer to either inquiry, then the policies in effect at the plant are not protected by Section 703(h).[14]

III.   LUNCH POLICY

■ As previously mentioned, the lunch practices of the plant's employees have been

12. Section 703(h) reads in part:
   (h) Notwithstanding any other provision of this title, it shall not be an unlawful employment practice for an employer to apply different standards of compensation, or different terms, conditions, or privileges of employment pursuant to a bona fide seniority or merit system, or a system which measures earnings by quantity or quality of production or to employees who work in different locations, provided that such differences are not the result of an intention to discriminate because of race, color, religion, sex, or national origin, . . . .

13. The EEOC maintains that subjective factors infect promotion and transfer decisions concerning female employees at the Chardon plant, *i. e.,* even women who are senior bids on a job are actively discouraged for subjective reasons from filling a vacancy. If such subjective factors are present, the promotions and transfer policies at the plant cannot constitute a *bona fide* seniority system. *See Williams v. Colorado Springs,* 641 F.2d 835 (10th Cir. 1981); *James v. Stockham Valves & Fitting Co.,* 559 F.2d 310 (5th Cir. 1977), *cert. denied,* 434 U.S. 1034, 98 S.Ct. 767, 54 L.Ed.2d 781 (1978).
   Promotions of salaried or supervisory personnel at Chardon are based entirely upon subjective criteria and thus are not made pursuant to a *bona fide* seniority system.

14. The district court should not begin proceedings to resolve this issue until the Supreme Court renders a decision in *Patterson v. American Tobacco Co.,* 634 F.2d 744 (4th Cir. 1980), *cert. granted,* —— U.S. ——, 101 S.Ct. 3078, 69 L.Ed.2d 951 (1981).
   In *Patterson,* the Fourth Circuit held that under *Teamsters v. United States, supra,* § 703(h) immunized only those seniority systems in place before the time of Title VII's effective date—1965. 634 F.2d at 749–50. Ball Corporation's promotions and transfer policies came into effect in 1969. Assuming that the policies are a seniority system and that they are *bona fide* under *James v. Stockham Valves & Fitting Co., supra* at 350–53, they would nevertheless not be protected by § 703(h) under *Patterson.*
   Certiorari has also been granted in *Swint v. Pullman-Standard,* 624 F.2d 525 (5th Cir. 1980), *cert. granted,* 451 U.S. 906, 101 S.Ct. 1972, 68 L.Ed.2d 293 (1981). The district court should not begin proceedings in this case until the Supreme Court has also rendered a decision in *Swint.*

the subject of collective bargaining between Ball Corporation and the Union. The lunch provision in the 1966 contract explicitly treated male and female employees in a different fashion.[15] In 1972, the employment agreement was revised to incorporate the following facially neutral terms:

> When a department or a portion thereof is scheduled for three (3) shifts, the normal work day for finishers shall be eight (8) hours including a thirty (30) minute unpaid lunch period. All other production workers will work eight (8) hours and eat their lunch at a time when the work load permits without unduly interfering with the efficient operation of their duties.

Since the above provision is facially neutral, the district court properly focused on the effect of the provision. Thus, the *Griggs v. Duke Power Co.* or disparate impact line of cases, rather than the disparate treatment line, provides the proper mode of analysis here. *See Teamsters v. United States, supra,* 431 U.S. at 335–36 n.15, 97 S.Ct. at 1854–1855 n.15; *Grano v. Department of Development,* 637 F.2d 1073, 1081 (6th Cir. 1980).[16]

It is uncontested that the lunch provision has a disparate impact against women.

Since women fill the vast number of "finisher" positions at the plant, the above provision operates to preclude more women than men from working a full eight-hour day. Thus, the inquiry below focused upon whether Ball Corporation demonstrated that the disproportionate effect on women resulting from the operation of the lunch provision, was justified by business necessity. Upon a review of the record, we believe that the district court correctly found that the lunch policy is justified by business necessity.

The concept of business necessity in the Title VII area has been a much discussed issue. In this circuit, there has been recent controversy over what constitutes the proper standard for maintaining the defense. *See Chrisner v. Complete Auto Transit, Inc.,* 645 F.2d 1251 (6th Cir. 1981). However, the district court in this case applied the proper standard. The evidence showed an extremely high correlation between the lunch policy and the performance requirements of production workers and finishers. It is undisputed that McNeil press operators,[17] cannot eat lunch "on the run" and efficiently operate their machines at the same time.[18] It is also uncontested that

---

**15.** The 1966 Collective Bargaining Agreement provided in relevant part:

> 5.3 When an operation is scheduled for three (3) shifts, the normal work day for women employees shall be eight and one-half (8½) consecutive hours, including a thirty (30) minute unpaid lunch period, provided there are no machine limitations. Where there are machine or other limitations making it impractical to overlap employees, the normal work day for women employees shall be eight (8) consecutive hours, including a thirty (30) minute unpaid lunch period.

**16.** *In Teamsters, supra,* at 335–36 n.15, 97 S.Ct. at 1854–1855 n.15, the Supreme Court outlined the distinction between the disparate impact and disparate treatment Title VII analysis:

> "Disparate treatment" is the most easily understood type of discrimination. The employer simply treats some people less favorably than others because of their race, color, religion, sex or national origin. Proof of discriminatory motive is critical, although it can in some situations be inferred from the mere fact of differences in treatment. *See e. g. Arlington Heights v. Metropolitan Housing*

*Development Corp.,* 429 U.S. 252, 265–66 [97 S.Ct. 555, 563–565, 50 L.Ed.2d 450].

> Claims of disparate treatment may be distinguished from claims that stress "disparate impact." The latter involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity. Proof of discriminatory motive, we have held, is not required under a disparate-impact theory. *Compare e. g. Griggs v. Duke Power Co.,* 401 U.S. 424, 430–32 [91 S.Ct. 849, 853–854, 28 L.Ed.2d 158], with *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–06 [93 S.Ct. 1817, 1824–1826, 36 L.Ed.2d 668]. 431 U.S. at 335–36 n.15, 97 S.Ct. at 1854–1855 n.15.

**17.** McNeil press operators continue to be classified as finishers rather than as production workers.

**18.** Burt Bonness, a plant supervisor, testified that McNeil presses run 40 to 45 heats a shift, with time variables ranging from five to twenty minutes. Twenty minute heats are run on the

operators of conventional presses can eat lunch "on the run" while simultaneously running their machines.[19] Ball Corporation demonstrated that if McNeil press operators were allowed to eat "on the run", their presses simply would not function effectively during the thirty minute lunch period. This showing meets the high standard required to establish business necessity or manifest job relationship under *Griggs v. Duke Power Co. See Horace v. City of Pontiac*, 624 F.2d 765 (6th Cir. 1980); *Kirby v. Colony Furniture Co.*, 613 F.2d 696 (8th Cir. 1980); *Blake v. City of Los Angeles*, 595 F.2d 1367 (9th Cir. 1979), cert. denied, 446 U.S. 928, 100 S.Ct. 1865, 64 L.Ed.2d 281 (1980); *Mitchell v. Mid-Continent Spring Co. of Kentucky*, 583 F.2d 275 (6th Cir. 1978), cert. denied, 441 U.S. 922, 99 S.Ct. 2030, 60 L.Ed.2d 396 (1979); *Equal Employment Opportunity Commission v. New York Times Broadcasting Service, Inc.*, 542 F.2d 356 (6th Cir. 1976); *Parson v. Kaiser Aluminum & Chemical Corp.*, 575 F.2d 1374 (5th Cir. 1978), cert. denied sub nom., *United Steel Workers of America v. Parson*, 441 U.S. 968, 99 S.Ct. 2417, 60 L.Ed.2d 1073 (1979); *United States v. St. Louis-San Francisco Railway Co.*, 464 F.2d 301, 308 (8th Cir. 1972) (en banc), cert. denied, 409 U.S. 1116, 93 S.Ct. 913, 34 L.Ed.2d 700 (1973); *Head v. Timken Roller Bearing Co.*, 486 F.2d 870, 879 (6th Cir. 1973); *United States v. Bethlehem Steel Corp.*, 446 F.2d 652, 662 (2d Cir. 1971); *Robinson v. Lorillard Corp.*, 444 F.2d 791 (4th Cir. 1971), cert. dismissed, 404 U.S. 1006, 92 S.Ct. 573, 30 L.Ed.2d 655 (1971).[20]

The EEOC, citing *Head v. Timken Roller Bearing Co., supra*, at 879, argues that Ball did not establish business necessity here because it did not show that there was "no available acceptable alternative policy." However, this contention is based on a misreading of our opinion in that case. In *Head*, the issue of which party properly has the burden of proving less discriminatory alternatives was not before the court. Thus, the decision provides no precedent on that issue. See *Chrisner v. Complete Auto Transit, supra* at 1266–67 n.6 (Keith, J., concurring and dissenting). Subsequent decisions have made clear that in Title VII disparate impact cases, the plaintiff has the

---

machines only "two or three times in a year." In addition, the presses open up automatically at the end of each press. Thus, the McNeil press operators must devote constant attention to their machines. Bonness testified that this does not leave enough time for McNeil press operators to "eat on the run." The EEOC presented no evidence contradicting this conclusion.

19. Conventional presses have a longer cure time than the McNeil presses have. Conventional presses run 30 to 35 heats per shift, in seven minute to one hour time variables. Bonness testified that because of relatively long cure times on the Conventional, St. Joseph and French Oil presses, operators of the machines could eat "on the run." As the district court pointed out, it is also significant that these presses do not automatically open at the end of a heat. Thus, operators of these machines could take idle time beyond the cure period without risking damage to his product.

20. In *Chrisner v. Complete Auto Transit, Inc.*, 645 F.2d 1251 (6th Cir. 1981), we adopted the following standard:

When a job requires a small amount of skill and training and the consequences of hiring an unqualified applicant are insignificant, the courts should examine closely any pre-employment standard or criteria which discriminates against minorities. In such a case, the employer should have a heavy burden to demonstrate to the court's satisfaction that his employment criteria are job related. On the other hand, when the job clearly requires a high degree of skill and the economic and human risks involved in hiring an unqualified applicant are great, the employer bears a correspondingly lighter burden to show that his employment criteria are job related

*Id.* at 1262 (quoting *Spurlock v. United Airlines*, 475 F.2d 216, 219 (10th Cir. 1972)). However, this standard applies only to that narrow category of jobs which greatly implicate human safety, e. g. airline piloting and over-the-road truck driving. *Chrisner* is to be narrowly read. It applies only in those cases where public safety is demonstrably jeopardized—and even then, the defendant must show by competent evidence that the selection criteria or employment condition is manifestly related to the protection of human safety. In all other cases, including this one, the employer has no shifting burdens. In order to rebut a *prima facie* case, it has the burden of showing that use of the employment condition or selection device is compelled by business necessity.

burden of showing less discriminatory alternative policies. *See Albemarle Paper Co. v. Moody*, 422 U.S. 405, 425, 95 S.Ct. 2362, 2375, 45 L.Ed.2d 280 (1975). *See also* Note, *Business Necessity: Judicial Dualism and the Search for Adequate Standards*, 15 Ga. L.Rev. 376, 398–9 (1981).

Thus, the EEOC had the burden of showing the availability of a less discriminatory lunch policy in order to rebut Ball Corporation's showing of business necessity. The EEOC presented no evidence showing the availability of such a policy; therefore, the district court's ruling as to this issue is affirmed.

### CONCLUSION

For the foregoing reasons, the judgment of the district court is affirmed in part and reversed in part. This case is remanded to the district court for further proceedings consistent with this opinion.