983 F.2d 1066
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Dr. P.K. GEEVARGHESE, Plaintiff-appellant,
v.
Edward E. CAHILL and Dr. John Trimpey, individually and in
their official capacities, and University of
Tennessee at Chattanooga, Defendants-appellees.
 No. 92-5285.
 United States Court of Appeals, Sixth Circuit.
 Dec. 8, 1992.
 
 Before BOYCE F. MARTIN, JR. and BOGGS, Circuit Judges, and CONTIE, Senior Circuit Judges.
 PER CURIAM.
 
 
 1
 Plaintiff-appellant, Dr. P.K. Geevarghese, appeals the district court's grant of summary judgment to Edward E. Cahill and Dr. John Trimpey, individually and in their official capacities, and to the University of Tennessee at Chattanooga, defendants-appellees.
 
 I.
 
 2
 This case arises from an employment discrimination suit and age discrimination suit brought by plaintiff, who was employed in the Department of Sociology at the University of Tennessee.
 
 
 3
 The complaint names as defendants the University of Tennessee at Chattanooga ("UTC"), the former head of the UTC Department of Sociology and Anthropology, Edward Cahill, and the former dean of the UTC College of Arts and Sciences, John Trimpey.
 
 
 4
 The plaintiff alleges that during his twenty-two years of employment with UTC as an associate professor of anthropology and sociology, the defendants discriminated against him on the basis of national origin, in violation of 42 U.S.C. § 2000e, et seq. (Title VII), and on the basis of age, in violation of 29 U.S.C. § 621, et seq. (ADEA), both with regard to promotion and salary increases.[1]
 
 
 5
 In September 1968, plaintiff was hired as an associate professor of anthropology and sociology at UTC. He became a tenured employee in 1972. From August 1, 1975--July 31, 1990, Dr. Cahill was the head of the Department of Sociology and Anthropology at UTC, and was responsible for making promotion and salary increase recommendations for the department. Dr. Trimpey, at the relevant time, was dean of the UTC College of Arts and Sciences, and was responsible for reviewing the promotion recommendations and salary increases made by department heads such as Dr. Cahill.
 
 
 6
 In 1979, plaintiff, Dr. Geevarghese, formally applied for a promotion to the rank of professor, which was denied by the Committee of Rank and Tenure.[2]
 
 
 7
 The 1984 version of the UTC Faculty Handbook, which was being used by the University at all times material to this action, sets out the applicable procedures concerning promotions and salary increases for UTC faculty members. With regard to promotions, the Handbook provided that:
 
 
 8
 1. Recommendations (denial and approval) for reappointment, and promotion are submitted by the department head, or other appropriate administrative officer, after consultation with the rank and tenure committee of the department....
 
 
 9
 The head is not obliged to follow the majority recommendation of the committee, but in the event of disagreement the head must explain the decision frankly and openly to the committee and must give the committee members an opportunity to submit a dissenting report, if they so desire, with the head's forwarded recommendation. In any event, the vote of the rank and tenure committee must be reported and explained to the administrative official receiving the recommendation. As part of the continuing evaluation and development-by-objective process, each faculty member is evaluated periodically in relation to promotion, ... or the granting of tenure. The faculty member will be advised in writing by the department head or other appropriate administrative official of the schedule for this evaluation, and will be given the opportunity to submit evidence relevant to performance and future promise.
 
 
 10
 With regard to salary increases, the Handbood provided that:
 
 
 11
 2. Salary decisions are made by the department head or other appropriate administrative officer after consideration of the faculty member's annual evaluation and a number of related factors, including career longevity and general salary levels of the discipline and rank. Faculty as a whole are not usually consulted directly by the department head about precise salary decisions for any person, though the department head should share with them general principles and reasoning in defining salary recommendations.
 
 
 12
 As the head of the department, Dr. Cahill had to decide whether to overrule the determination of the Committee of Rank and Tenure that plaintiff not be promoted. Dr. Cahill then submitted a book by plaintiff to three external reviewers for peer review. After receiving two negative reviews, Dr. Cahill decided not to overturn the decision of the Committee of Rank and Tenure.
 
 
 13
 During the ensuing years, the relationship between plaintiff and Dr. Cahill deteriorated. In 1987, plaintiff again applied for promotion to the rank of professor, which was denied by the Committee of Rank and Tenure. Dr. Cahill recommended that plaintiff's promotion request be denied. Although the Provost recommended promotions for another faculty member of Indian national origin, Dr. Piem Chopra, and one older than plaintiff, he declined to overturn the recommendation to deny promotion to plaintiff.
 
 
 14
 In the 1988-89 academic year, plaintiff did not receive a salary increase because he refused to participate in the EDO process[3] with Dr. Cahill. That year several other professors were denied salary increases because of failure to sign EDO's.
 
 
 15
 During the 1989-90 academic year, plaintiff made his third application for promotion, which was granted by the Rank and Tenure Committee. By this time, he had published a monograph and made two presentations at meetings of professional sociologists. Consequently in August 1990, plaintiff was promoted to full professor, whereas at least five non-Indian associate professors with as much or more seniority were not promoted.
 
 
 16
 On September 5, 1990, plaintiff filed a complaint in the United States District Court for the Eastern District of Tennessee, alleging that during his 22 years of employment with UTC as an associate professor of anthropology and sociology, defendants discriminated against him on the basis of national origin, in violation of 42 U.S.C. § 2000e, et seq. (Title VII), and on the basis of age, in violation of 29 U.S.C. § 621, et seq. (ADEA), both with regard to promotions and salary increases. In addition to his disparate treatment claims, plaintiff further alleged pendent state law claims against Dr. Cahill for libel and for interference with Dr. Geevarghese's right to progress in his profession.
 
 
 17
 The defendants moved for summary judgment on the plaintiff's federal question claims, alleging that plaintiff was not qualified for promotion prior to August, 1990, or for additional salary increases during his employment with UTC. Defendants also alleged that no reasonable finder of fact could determine that the legitimate reasons underlying plaintiff's treatment at UTC were a pretext for national origin or age discrimination.
 
 
 18
 The district court granted defendants' motion for summary judgment because plaintiff failed to present evidence of discriminatory intent, an essential element of both claims. The district court dismissed the plaintiff's pendent state law claims without prejudice.
 
 
 19
 Plaintiff timely appealed.
 
 II.
 
 20
 We must determine whether the district court erred in granting summary judgment to defendants because plaintiff failed to present sufficient evidence of discriminatory intent, an essential element of the Title VII employment discrimination claim.
 
 
 21
 Summary judgment may be granted against a party who fails to make a sufficient showing to establish the existence of an element essential to the party's case, on which the party will have the burden of proof at trial. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).
 
 
 22
 To prevail in a disparate treatment case under Title VII, a plaintiff must prove by either direct or circumstantial evidence that the defendant had the subjective intent to discriminate against him in order to establish liability. Lynch v. Freeman, 817 F.2d 380, 382 (6th Cir.1987); Shah v. General Elec. Co., 816 F.2d 264, 267-69 (6th Cir.1987). This is a question of fact. Lynch, 817 F.2d at 382.
 
 
 23
 Under the analysis articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), a plaintiff initially bears the burden of establishing a prima facie case of employment discrimination. In a Title VII suit, a prima facie case of national origin discrimination is established if the plaintiff can show by a preponderance of the evidence that the defendant took action adversely affecting either the plaintiff's compensation, terms, conditions or privileges of employment under circumstances which give rise to an inference of discrimination based on national origin. Shah, 816 F.2d at 267. This inference arises if the plaintiff shows that he is a member of a protected class, that he was qualified for a particular position, and that he was treated differently from similarly situated individuals who were of a different national origin. Id.
 
 
 24
 Where the plaintiff has met his burden of production, the defendant is required to rebut the presumption of discrimination by articulating a legitimate, nondiscriminatory reason for any adverse employment decision. The Supreme Court has held that the defendant meets this burden if it "clearly set[s] forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection." Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 255 (1981). If the defendant successfully offers a reasonable explanation for its actions, then the burden shifts back to the plaintiff to establish that the offered reasons are pretextual and that intentional discrimination was a determinative factor in any adverse employment action taken against him. Wilson v. Firestone Tire & Rubber Co., 932 F.2d 510, 514 (6th Cir.1991); Shah, 816 F.2d at 267.
 
 
 25
 Under this analysis, we believe the plaintiff in the present case has failed to establish an essential element of his case for the following reasons. In his complaint and supplemental pleadings, plaintiff maintains that Dr. Cahill unfairly assessed the scholarly merits of his work from 1979 to 1989, refused to recommend him for promotion in 1979 and 1987, refused to recommend his 1988-89 salary increase, intentionally manipulated his EDO and student evaluations, and generally harassed him solely because he was of Indian national origin. Further, plaintiff contends that by refusing to overrule any of Dr. Cahill's evaluations or promotion and salary recommendations, and by forwarding those recommendations to the Provost, Dean Trimpey supported Dr. Cahill's abusive conduct solely because of the plaintiff's national origin. Plaintiff submits in support of these allegations several affidavits of colleagues, who state they believe plaintiff was treated unfairly by Dr. Cahill.
 
 
 26
 However, even if the allegations about Dr. Cahill's alleged unfair treatment are presumed to be true, there is insufficient evidence that his actions were motivated by plaintiff's national origin. As the magistrate, whom the parties agreed should try the case, stated:
 
 
 27
 [T]he chain of events described in the parties' pleadings and supporting affidavits clearly indicate that Dr. Geevarghese and Dr. Cahill simply did not get along personally or professionally. Both men clearly had a difference of opinion concerning staff priorities, evaluations, and Dr. Geevarghese's abilities. Further, both men clearly have very strong and distinct personalities, and there should be no question that over time each one found it extremely hard to communicate and trust the other. The bottom line is fairly simple: Dr. Cahill and Dr. Geevarghese did not like one another. The record suggests, however, that this was not due to Dr. Geevarghese's national origin or age, but because they had a personality conflict. While this fact raises the question of whether or not Dr. Cahill abused his authority over Dr. Geevarghese, it is important to remember that personality conflicts alone cannot supply a basis for finding intentional discrimination. Grubb v. W.A. Foote Memorial Hosp. Inc., 741 F.2d 1486, 1498-99 (6th Cir.1984). Therefore, while it is arguable that Dr. Cahill may have been unfair to Dr. Geevarghese during his tenure as head of the UTC Anthropology and Sociology Department, such does not, without more, subject the defendants to liability under Title VII or the ADEA. See Burdine, 450 U.S. at 259; Wilkins v. Eaton Corp., 790 F.2d 515, 521 (6th Cir.1986); Grubb, 741 F.2d at 1498-99.
 
 
 28
 For these reasons, the Court concludes that the defendants are entitled to summary judgment. Dr. Geevarghese has simply failed to seriously oppose the nonpretextual explanations offered by defendants for his treatment, other than by his own conclusory assumptions that such conduct was based on unlawful discrimination. This is simply an insufficient basis for denying the defendants' motion. Gagne, 881 F.2d at 316.
 
 
 29
 District Court Opinion, App. p. 409-10.
 
 
 30
 We agree with this analysis. Plaintiff has simply failed to present any evidence of discriminatory intent on the part of Drs. Cahill and Trimpey or the University. Similarly situated non-Indians also failed to receive salary increases and promotions and persons of Indian national origin received salary increases and promotions. Because there is no evidence that similarly situated employees were treated differently on the basis of their national origin, there is no evidence of pretext in the Title VII case.
 
 
 31
 Defendants have offered a rational explanation for the actions they took in regard to plaintiff, contending that he was denied promotion because his scholarship was deficient and that he was denied salary increases because he refused to comply with the EDO procedure. Although there is a dispute about the scholarly merit of plaintiff's academic work, this is not a material fact. Deficient scholarship is a legitimate non-discriminatory reason to deny tenure and promotion in a university setting. Gutzwiller v. Fenik, 860 F.2d 1317 (6th Cir.1988). As this court pointed out in Gutzwiller:
 
 
 32
 The Supreme Court ... has ... made clear that absent evidence of a constitutionally impermissible basis for a challenged academic decision ... courts and juries must be extremely reluctant to second guess the professional judgment of the academic decisionmakers.... Only when the challenged decision is arbitrary and capricious, and without rational basis, may it be set aside upon judicial review.
 
 
 33
 Id. at 1331 (citations omitted). In the present case, there is no evidence that the University's actions were without rational basis and completely arbitrary and capricious, because plaintiff was initially denied promotion by the Rank and Tenure Committee, not Dr. Cahill, and initially received negative reviews on the manuscript for his book. Plaintiff also refused to comply with the requirements of the EDO evaluation procedure with Dr. Cahill. Disagreement over the merits of plaintiff's work, without more, does not create an issue of fact as to whether the reasons articulated by UTC are a pretext for intentional discrimination.
 
 
 34
 Because there is insufficient evidence of pretext, which is a material fact that plaintiff has the burden of proving at trial, we believe the district court correctly granted defendants' motion for summary judgment. Plaintiff refused to cooperate with Dr. Cahill in EDO evaluations for salary increases and other similarly situated persons, who were not Indians, were also denied salary increases for failure to cooperate in this process. Because the Committee of Rank and Tenure initially denied plaintiff promotion, both in 1979 and 1987, and Dr. Cahill was not a member of that Committee, we believe the University could rationally argue that his colleagues believed his scholarship was deficient. It would be futile to have a trial on the merits to determine whether plaintiff's scholarship was in fact deficient during this time period, because it cannot be shown that there was absolutely no question that plaintiff's scholarship was not deficient and that this alleged deficiency was just a pretext for discrimination.
 
 
 35
 For these reasons, the opinion of the district court is hereby AFFIRMED.
 
 
 
 [1]
 At oral argument, plaintiff-appellant agreed to drop the age discrimination claim on appeal
 
 
 [2]
 Each academic unit at the university maintained a standing committee for rank and tenure considerations. The full membership of the committee consisted of all tenured faculty within the department with the exception of the head. The constitution of the Rank and Tenure Committee stated:
 The membership of the rank and tenure committee is to consist of at least three members. If there are not three tenured faculty within the department, the committee will be augmented by tenured faculty from allied departments, generally within the same school or college but, if necessary, drawn from outside those areas. The department head shall prepare a list of tenured candidates for the committee, at least two for each position, giving consideration to the department faculty members area of expertise ... members will then be elected by majority vote of all tenured and tenure track members of the faculty in the department. For tenure decisions, the committee will sit as a whole. For promotion decisions, consideration will be by only those members of the committee at the rank to which promotion is to be made or higher rank....
 
 
 [3]
 Salary increases are based on faculty evaluations, which are part of a process called EDO--Evaluation and Development by Objectives
 Procedurally, participation in the EDO process first involves the submission of an Individual Objectives Sheet completed by each faculty member during April of each school year. A week later, a conference is held between the faculty member and department head to agree on academic objectives for the next school year. During September and October of the following academic year, these individual objectives are reviewed and modified if necessary. The next step involves an Evaluation Conference which is held in early March of each academic year. Each faculty member completes an Individual Performance Report for the department head, in which the submitting faculty member states both why and how he/she feels that the goals set out in the personal objectives form have been met. The Department head then subsequently prepares an Individual Evaluation Report, in which he/she applies the respective departmental EDO criteria and assigns what is felt to be the appropriate merit rating of the faculty member's performance.